IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD BANKS, | ) | |
| PLAINTIFF, | ) | C.A. No. 06- 253 |
| | ) | |
| v. | ) | District Judge Joy Flowers Conti |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| JEFFREY A. BEARD, JOHN S. | ) | |
| SHAFFER, DONALD T. VAUGHN, | ) | |
| DONALD WILLIAMSON, | ) | |
| DR. FREDERICK MAUE, DR, LANCE | ) | Doc. No. 158 |
| COUTURIER, SUPERINTENDENT | ) | |
| DAVID J. GOOD, MICHAEL F. | ) | |
| KNOTT, KAREN NOLAN, FRANCIS | ) | |
| PIROZOLLA, LADD OWEYO, DAVE | ) | |
| ROBERTS, JAMES HARRINGTON, | ) | |
| JAMIE BOYLES, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.**         **RECOMMENDATION**

It is respectfully recommended that Defendants' Motion for Summary Judgment (doc. no. 158) be granted except as to Plaintiff's equal protection claims regarding Defendants' denial of his hard cover Qu'ran and his religious headgear.

**II.**         **REPORT**

Plaintiff is a prisoner currently confined in the Secure Special Needs Unit (SSNU) at the State Correctional Institution at Retreat, which is located in Hunlock Creek, Pennsylvania. His Amended Complaint (doc. no. 81) alleges violations of 42 U.S.C § 1983 as well as the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a), with regard to the conditions of confinement in the Long term Segregation Unit (LTSU) and Special Management Unit

1

(SMU) at SCI-Fayette and the SSNU at SCI-Cresson and other state correctional institutions. Specifically, he claims that he was denied procedural due process and equal protection in regards to his placement and the conditions of confinement in level 5 restricted housing units at various state correctional institutions.  In addition, he claims that he has been denied the ability to practice his religion by Defendants' actions in refusing to allow him access to a hardcover Qu'ran (Qu'ran), a prayer rug, his religious headgear, and a wall clock to inform him and other Muslim prisoners of the correct time to pray.  Finally, he alleges that the conditions of confinement in level 5 security housing units, including the constant illumination, violates the Eighth Amendment.  He seeks declaratory and injunctive relief as well as monetary damages.  For the reasons that follow, Defendants are entitled to summary judgment as to all of Plaintiff's claims except his equal protection claims regarding Defendants' denial of his hardcover Qu'ran and his religious headgear.

### A. Standard of Review - Summary Judgment

Defendants have filed a motion for summary judgment pursuant to Fed. Rule Civ. Proc. 56.  Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case.").  The moving party bears the initial burden of identifying evidence that demonstrates the absence of a

genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth specific facts showing that there is a genuine issue for trial or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Fed. Rule Civ. Proc. 56(c).  *See also* Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry, then, involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting Anderson, 477 U.S. at 251-52).  If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted.  Anderson, 477 U.S. at 249-50.

## B. Statement of Facts

Ronald Banks is an inmate in the custody of the Pennsylvania Department of Corrections (DOC) and currently is housed in the SSNU at the State Correctional Institution at Retreat.  Banks' complains about the conditions of confinement in various security level 5 housing units, including the SSNU at SCI-Cresson, SCI -Camp Hill, SCI-Graterford, and SCI-Pittsburgh (see Amended Complaint, doc. no. 81, p. 2.  In this regard, Banks first was transferred to SCI-Cresson on or about July 26, 2005 and was placed in the SSNU upon his arrival.  He was transferred to SCI-Mahanoy on or about November 8, 2005.  Banks was transferred to the Mental Health Unit (MHU) at SCI-Frackville on November 11, 2005 and was there until November 28, 2005, when he was transferred back to SCI-Mahanoy and housed in the Restricted Housing Unit (RHU).  He was

transferred back to the SSNU at SCI-Cresson on January 30, 2006. After failing to adjust to the conditions in the SSNU, he was transferred to the LTSU at SCI-Fayette on March 14, 2006 and was housed in that unit until it was discontinued in February of 2007 and thereafter became the Special Management Unit (SMU) . He was transferred to the SSNU at SCI-Camp Hill in early 2008 and was transferred to the SSNU at SCI-Retreat in March of 2009 where he currently resides.

According to DOC policy, every inmate in DOC custody is annually evaluated and placed in a specific custody level ranging from 1, being the lowest, to level 5, being the highest. DC ADM  Reception and Classification Policy, 11.2.1, Section VI. Procedures.

> Custody Level 5 - This level is assigned to those inmates who have demonstrated, through a pattern of maladjustive, assaultive behavior, or through a need for protection that they require a high degree of structure. They require continual direct and indirect supervision by staff. These inmates are afforded the opportunity to participate only in selected programs in his/her cell or in small, controlled, highly supervised groups on the housing unit. They are inmates who either would pose a high level of risk to others or may be at risk themselves if permitted access to general population areas. When out of his/her cell, he/she is always under escort, except as otherwise permitted by the Program Review Committee. They receive visits only in the housing unit, or designated secure areas and the visits are non-contact. Custody level 5 is the most restrictive level and inmates assigned to this level should be housed in units with a security level rating of 5.

11.2.1, Reception and Classification Policy Page 4 section VI.B.5. Plaintiff's records indicate that he has had over 100 misconducts and is classified as a custody level 5 inmate (doc. no. 81-2, p. 3) and, therefore, must be housed in a security level 5 unit.

The RHU, LTSU, SMU, and SSNU all are classified as Level 5 housing units, the most secure units in the DOC system (doc. no. 159-2, p. 5). Each DOC institution has an RHU to house inmates who either have broken institutional rules or otherwise need confinement in a secure

environment (doc. no. 159-2, p. 4 at ¶ 9).[1]  The LTSU, which was discontinued in 2007, was the most restrictive class in the Pennsylvania prison system.  It existed in only one location at a time and housed approximately forty inmates, the proverbial "worst of the worst" prisoners in the entire system (doc. no. 159-2, p. 4 at ¶8).  Prisoners in the LTSU were allowed very limited access to personal property, education and religious programs, they were confined to their cells for 23 hours per day, allowed three showers per week, their sentences in the LTSU were indefinite, the lights were on for 24 hours per day, there was constant noise, and inmates often threw feces which did not get cleaned up for some time.[2]  The LTSU was phased out and replaced with the SMU in February of 2007.

The first SSNU was opened at SCI-Cresson in December, 2004 (doc. no. 159-2, p. 5).  The SSNU was designed to provide an inmate who has identified mental health issues and numerous Restricted Housing Unit (RHU) placements (*e.g.*, disciplinary time), with a specialized treatment program to assist him or her in returning to a general population Special Needs Unit (SNU) (see DC-ADM 13.8.1 Access to Mental Health Care Procedures Manual, Section 10- Secure Special Needs Unit (SSNU)).  The DOC developed the SSNU program because of a concern that inmates with significant mental health issues were being confined long-term in the LTSU and/or in the various RHUs, with no consistently effective mechanism to reintegrate them into general population (doc. no. 159-2, p. 4).  The program was designed to house an inmate for 18 months and to provide an avenue for the reintegration of inmates with mental health issues who have also incurred lengthy periods of disciplinary custody time (doc. no. 159-2, pp. 5, 39).  The SSNU is a five

---

1.  *See also* DC-ADM 801 and DC-ADM 802.

2.  Rivera v. Pennsylvania Dept. of Corrections  837 A.2d 525, 530-532 (Pa. Super. 2003).

phased multi-disciplinary treatment program (doc. no. 159-2, p. 43).  Participation in treatment program is based on a phase system in accordance with the SSNU Privileges Chart. The treatment phase system uses

progressive steps to increase privileges.  Movement to a lower treatment phase is based on appropriate inmate behavior and compliance with his or her Individual Treatment Plan (ITP).  The initial treatment phase is determined by the inmate's present level of functioning, recent historical information, and mental status.  The SSNU treatment team recommends all treatment phase changes and the SSNU team and the Program Review Committee (PRC) monitors the behavior of every SSNU inmate and may grant specific privileges according to the phase system.  The SSNU Team, in conjunction with the PRC, may terminate all phases and privileges at any time, based upon the inmate's behavior and compliance with his/her ITP (doc. no. 159-2, p. 43).  Accordingly, as inmates progress through the system, they are afforded additional privileges.  An inmate is housed in a SSNU for a maximum of 18 months, unless extended by the SSNU Management Team (doc. no. 159-2, p. 39).

All the restrictions that are in place in the SSNU are also in place in the RHU and other Level 5 housing units (doc. no. 159-3, pp. 1-4 "SSNU Privileges and Services" chart, p. 6 "RHU and SMU Privileges" chart and  p. 7, "LTSU Privileges" chart).  DOC regulations show that the restrictions placed on an inmates housed in the LTSU were more severe when compared to those placed on an SSNU inmate. Generally speaking, an entry level SSNU inmate is afforded the same privileges and is under the same restrictions as an inmate serving disciplinary custody time in the RHU.  Unlike the RHU, however, an entry level inmate in the SSNU has an individual treatment program and access to a greater level of mental health services.  All inmates in the SSNU, regardless

of their level, have the opportunity to have weekly in-cell visits from a chaplain of their faith.  As

he progresses through the program, an inmate in the SSNU may earn additional privileges (doc. no.

159-2, p. 44, doc. no. 152-3, pp. 2-4)).  Once an inmate attains Phase 3, he has the opportunity to

earn, among other things, the following privileges that are generally not available to inmates in

either the RHU or LTSU:  the ability to move about outside his cell on selected occasions without

handcuffs; the ability to possess a radio in his cell; the opportunity to eat some of his meals in a

common area with other inmates; the opportunity to be in the day room with another inmate;  the

ability to attend one out-of-cell religious and one out-of-cell educational function per week; and

additional telephone calls and visits (doc. no. 159-3, p. 3).  Unlike the RHU or LTSU, the SSNU had

a radio and television available at predetermined times in the common area of the unit. Regardless

of an inmate's level in the program, he was able to listen and/or watch programs on this radio and

television, whenever one was on.  In contrast, LTSU inmates had no access to or ability to listen to

the radio or to watch television under any circumstances regardless of what phase he may have

progressed to (doc. no. 159-2, p. 7).  Thus, the SSNU is less restrictive in nature than an RHU and

inmates housed therein have the opportunity to earn additional privileges through compliance with

the program's requirements.  By DOC policy, all inmates being placed into the SSNU receive notice

of that placement and receive periodic reviews similar to those provided to inmates in the LTSU and

SMU.

        Pursuant to policy, there is a "night light" on at all times in the cells in the RHU and

SSNU.  This light remains on at all times, however, it is relatively dim and is not the main light in

the cell (doc. no. 159-2, p. 15,  ¶ 26).  Sometime in 2005, Defendant Karen Nolan, a Unit Manager

in the SSNU, installed a wall clock in the SCI-Cresson SSNU in an attempt to confer an extra benefit

on the inmates housed in that unit (doc. no. 159-2, p. 30).  Prior to that time, there were no clocks in the Level 5 housing units at SCI-Cresson.  At some point, a wall clock in a nearby area of the same building broke, and some officers replaced it by moving the clock that was on the SSNU wall (doc. no. 159-2, p. 30).  The clock was not returned or replaced in the SSNU.

Plaintiff Banks is a Muslim.  Devout Muslims are expected to pray five times per day.  During the act of worship through prayer, a Muslim stands, and then bows and touches his or her forehead to the ground.  Muslims must pray on a clean surface, typically, a prayer rug.  Muslims refer to the Qu'ran (or Koran) in practicing their religion.  The Qu'ran only exists in Arabic but there are many translations of the Qu'ran , including the Noble Qu'ran and the Holy Qu'ran (doc. no. 159-3, p. 41, ¶¶ 15-16).

While Inmate Banks was housed in the SSNU at SCI-Cresson, he was not allowed to possess any religious accessories other than a soft cover Holy Bible or its equivalent.  This prohibition included religious headgear and prayer rugs  During the time period in question in this case, the chaplaincy department had Holy Qu'rans that it could donate to inmates (doc. no. 159-2, p. 36, ¶ 13) .  It did not have any Noble Qu'rans because no outside entity had donated any to the institution.  During the time of his confinement at SCI-Cresson, Mr. Banks could have purchased a soft cover Noble Qu'ran from an outside approved vendor, assuming he had sufficient funds to do so (doc. no. 159-2, p. 36,  ¶ 14).

### C. Liability under 42 U.S.C. § 1983

Plaintiff asserts liability against Defendants pursuant to 42 U.S.C. § 1983.  In order to assert liability under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements.  He must allege:  1) that the alleged misconduct was committed by a person acting under color of state law;

and 2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  Parratt v. Taylor, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, Daniels v. Williams, 474 U.S. 327, 330-331 (1986).

Plaintiff's claims against the remaining Defendants allege violations of his rights as protected by the First, Eighth and Fourteenth Amendments.  These claims are discussed below.

### D. First Amendment

Plaintiff first complains that Defendants violated his rights as protected by the First Amendment, which provides as follows.

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend. I.  The First Amendment guarantees that all prisoners must be afforded reasonable opportunities to exercise their religious freedom.  Cruz v. Beto, 405 U.S. 319, 322 n. 2 (1972).  In order to state a violation of the right to exercise one's religion, a plaintiff must allege a "substantial burden" on the exercise.  *See, e.g.*, Thomas v. Review Bd., 450 U.S. 707, 718 (1981); Wisconsin v. Yoder, 406 U.S. 205, 218 (1972).[3]

Plaintiff alleges that, while he was housed in the SSNU at SCI-Cresson, SCI-Camp Hill, SCI-Graterford and SCIP,[4] Defendants did not permit him, as a prisoner housed in level 5

---

3.  *See also* Williams v. Sweeney, 882 F. Supp. 1520, 1523 (E.D. Pa. 1995); Madison v. Horn, 1998 WL 531830, at *8 (E.D. Pa. Aug. 21, 1998).

4.  Plaintiff filed this action on October 25, 2006, and filed an amended complaint on February 21, 2008 (doc. no. 81).  Under the applicable statute of limitations, he may complain about the conditions of confinement that occurred two years prior to the filing of his original complaint. See Wilson v. Garcia, 471 U.S. 261, 272-76 (1985) (42 U.S.C. § 1983) (holding that the limitations period for civil actions brought under 42 U.S.C. § 1983 is determined by state law).

security housing, to possess a hardcover Qu'ran, his religious headgear or "Kufi" (or "kufee"), his prayer rug, and have access to a wall clock, which Plaintiff asserts is essential to his religious observance as a Muslim.  He claims that such restrictions violated his free exercise rights under the First Amendment as well as his statutory rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a).  Congress passed RLUIPA to grant heightened protection to prisoners from burdens imposed by the government.  <u>Washington v. Klem</u>, 497 F.3d 272, 276 (3d Cir. 2007).  Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest." 42 U.S.C. § 2000cc-1(a).  If the plaintiff "produces prima facie evidence to support a claim alleging a [RLUIPA] violation ... the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion."  <u>Id</u>. § 2000cc-2(b).

In their Motion, Defendants assert that Plaintiff has not met his burden of showing that Defendants' actions substantially burdened his ability to exercise his religion under the Free Exercise Clause and/or RLUIPA.  Because RLUIPA protects a prisoner's rights more than the Free Exercise clause, I will proceed under that analysis.

A plaintiff-inmate bears the burden to show that a prison institution's policy or

---

Under Pennsylvania law, the applicable limitations period for civil rights actions asserted under 42 U.S.C. § 1983 is two years.  <i>See</i> 42 Pa. Cons. Stat. § 5524.

official practice has substantially burdened the practice of that inmate's religion.  Washington, 497 F.3d at 277-278.  A substantial burden exists where:  1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.  Washington, 497 F3d. at 280.  In so concluding, the Court stated that its interpretation was broad enough to accurately reflect the statute's plain text and to effect its purpose.  Id.  Notwithstanding, the Court cautioned that, "[i]n interpreting the definition of substantial burden, we must keep in mind the plain text of the statute. Adopting [a narrower holding] would read "substantial" out of the statute."  Id. at 281.

In Washington, the Court held that the 10-book limitation substantially burdened the prisoner's religious exercise under the second part of the "substantial burden" test because it limited his ability to read four books each day, which  the parties agreed he must do to practice his religion.  497 F.3d at 282-83.  Here, DOC has submitted the affidavit of Imam Adeeb Rasheed.  Imam Rasheed has been employed by the DOC as the Imam at SCI-Camp Hill since 1990 (doc. no. 159-3, p. 39).  Prior to that time, he served as the contract Muslim Chaplain at SCI-Muncy, SCI-Frackville and SCI-Camp Hill.  Since 1993, he has served as the Executive Director and Imam for the Islamic Center in Harrisburg, Pennsylvania.  Imam Rasheed's declarations demonstrate that, even if there are questions of fact regarding DOC policy in level 5 security housing regarding an inmates ability to wear or possess religious headgear and possess hardcover books, Defendants' actions as alleged by Plaintiff did not substantially burden the practice of his Muslim faith.

As Defendants point out, the undisputed evidence in this case reveals the following.

11

Devout Muslims are expected to pray five times per day:  a morning prayer, a noon prayer, an afternoon prayer, a sunset prayer, and a night prayer.  Muslim prayers do not have to occur with any mathematical precision but generally should occur between the following positions of the sun: 1) morning prayer may be offered from break-of dawn until just before sunrise; 2) noon prayer may be offered from just after midday until afternoon; 3) afternoon prayer may be offered from late afternoon until just before sunset; 4) sunset prayer may be offered from sunset until darkness; and 5) night prayer may be offered throughout the night hours. (doc. 159-3, p. 40, ¶ 9).  Prior to prayer, a Muslim is required to wash his or her face, hands, and feet with clean water.  This washing can be performed in a restroom sink.  Muslims must pray on a clean surface and an inmate may pray on a clean floor, such as the floor of the prison cell (doc. 159-3, p. 40,  ¶ 6).  It is the adherent's responsibility to keep his/her living quarters clean for this purpose.  A Muslim may use a blanket or towel instead of a prayer rug without invalidating his or her prayers.  It is recommended and preferred that a Muslim wear a head covering during prayer; however, if a head covering is not worn, it does not invalidate the prayer (doc. no. 159-3, p. 41,¶ 12).

Plaintiff Banks first asserts Defendants substantially burdened his faith by removing and not replacing the wall clock in the SSNU at SCI-Cresson.  In this regard, the evidence shows that, at some point in 2005, Ms. Nolan installed a clock in the SSNU at SCI-Cresson in an attempt to confer an extra benefit on the inmates housed in the SSNU.  As stated earlier, the clock was later removed.  It later was determined that the clock should not be replaced due to security concerns.  Specifically, the clock caused tension because the inmates became belligerent and angry when appointments were not kept to the second (doc. no. 159-2, p. 30).  In addition, Defendants claim that because the inmates in that unit, all of whom are potentially problematic and/or violent, were using

12

the clock to  time the activity of the unit staff, it presented a serious security concern as it would facilitate prohibited activity, in part by enabling inmates to be able to precisely predict staff activity (doc. no. 159-2, pp. 13 and 21).

Plaintiff claims that there is a clock in the SSNU at SCI-Retreat, thus, Defendants' assertion of a security threat is without merit.  Regardless of whether there is a clock in the SSNU at SCI-Retreat, the record evidence shows that a Muslim inmate does not need to have access to a clock in order to properly exercise the requirements of his religion.  Thus, not having a clock does not have the effect of placing any pressure on a Muslim inmate to violate his beliefs.  In this regard, prior to Ms. Nolan placing the clock in the SSNU in 2005, there were no clocks in the Level 5 housing units at SCI-Cresson and Muslim inmates housed in those units were able to conduct their necessary prayers.  First, during Ramadan, prayer times are announced (doc. no. 159-2, p. 13). Second,  inmates are able to ask an officer for the time or hear the time from the radio and/or television that are on in the common area of the SSNU during various parts of the day.  Third, Chaplain Ladd Oyewo submitted an affidavit wherein he averred that he provided Mr. Banks with a prayer schedule on at least three occasions (doc. no. 159-2, p. 36).  Finally, as stated in the affidavit of Imam Rasheed, the prayer times do not have to occur with mathematical precision, they should generally occur between certain positions of the sun as outlined earlier. Plaintiff has not submitted any evidence to meet his burden of showing that these conditions were insufficient to provide him with adequate notice of the proper time to conduct his prayers throughout the day. Thus, Defendants are entitled to summary judgment as to this claim.

Next, Plaintiff claims that the denial of a prayer rug substantially burdened his ability to practice his religion.  The relevant policy and/or procedure that was in place when inmate Banks

was confined in the SSNU at SCI-Cresson did not permit any inmates in a Level 5 housing unit to possess a prayer rug.  Defendants claim that Prayer rugs present several security concerns. Specifically, prayer rugs can be used to cover the window of an inmate's cell, thus concealing the inmate's activities. In addition, prayer rugs provide another potential hiding place for contraband. Prayer rugs can also be used to clog toilets, enabling inmates to flood the housing unit.  Most importantly, inmates use prayer rugs. which have a frayed edging, to make "fishing lines" to pass contraband. The ability to pass contraband, including razor blades, handcuff keys, and drugs, from cell to cell poses a grave security risk to the institution (doc. no. 159-2, p. 14).

Defendants assert that the absence of a prayer rug does not have the effect of placing any pressure on a Muslim inmate to violate his beliefs.  First, Muslim inmates in the SSNU routinely use their state-issued blanket as a prayer rug (doc. no. 159-2, p. 14).  Second, Muslim inmates can pray on any clean surface, including a towel or even the clean floor of their own cells, which they are responsible for cleaning (doc. no. 159-3, p. 40).  Plaintiff has not submitted any evidence to show that Defendants' actions in denying him the use of a prayer rug substantially burdens the practice of his religion.  Consequently, Defendants are entitled to summary judgment as to this claim.  *Accord*

Mohammad v. Beard, 2007 WL 1439051, 1 (W.D. Pa. May 16, 2007) (granting Defendants' motion for summary judgment because Plaintiff failed to carry his burden of demonstrating that denying him a prayer rug in the LTSU imposed a substantial burden on the practice of his religion under the Free Exercise Clause of the First Amendment and RLUIPA); Perez v. Frank, 2008 WL 859716, 5 (E.D. Wis. Mar. 28, 2008) (granting Defendants summary judgment as to plaintiff's religious property claims under both RLUIPA and the Free Exercise Clause); Cole v. Litscher, No. 04-C-116 2005 WL

627791 (W.D. Wis. Mar. 15, 2005) (granting Defendants' motion for summary judgment because plaintiff did not make the initial "substantial burden" showing required).

Next, Plaintiff asserts that Defendants actions in prohibiting him from wearing his religious headgear, "Kufi," substantially burdened the practice of his Muslim faith.  It appears that there is some confusion as to whether inmates in level 5 security housing are denied religious headgear.  In this regard, Plaintiff has submitted a letter dated March 7, 2001 wherein Defendant Beard states that the prohibition against the wearing of Kufees in the Restricted Housing Unit at SCI-Smithfield has been lifted.  In addition, DOC policy provides that inmates in level 5 housing may "retain" religious headgear.  See DC-ADM 819 Religious Activities, Section VI.C.3(4)(e): "Religious headgear may be retained by the inmate in a Security Level 5 Housing Unit."

Again, whether or not all security level 5 inmates are denied headgear is not relevant to Plaintiff's RLUIPA claim.  Imam Rasheed's declaration provides that, while it is recommended and preferred that a Muslim wear a head covering during prayer, if a kufi or head covering is not worn, it does not invalidate the prayer.  Thus, any prohibition on kufis that may exist in various housing units in the DOC does not have the effect of placing any pressure on a Muslim inmate to violate his beliefs.[5]  Plaintiff has not submitted any evidence to show that Defendants' actions in denying him the use of religious headgear substantially burdened the practice of his religion.  *See* Borzych v. Frank, 439 F.3d 388, 390 (7th Cir.2006) (referring to the plaintiff's obligation to present evidence supporting a substantial burden finding).  Thus, Defendants are entitled to summary judgment as to this claim.

---

5.  The Court further notes that nothing in the record indicates that Plaintiff is precluded from using any other item of his allowed property such as a t shirt, towel or wash cloth, to cover his head during prayer, including his own hand.

As to Plaintiff's RLUIPA claim regarding access to a Qu'ran, the undisputed evidence

demonstrates that inmates in the SSNU are permitted to possess paperback religious texts. The

chaplaincy department at SCI-Cresson is authorized to provide inmates with religious texts;

however, they can only provide those texts that are donated to the institution by outside entities.

Chaplain Oyewo averred that he offered Banks a soft cover Holy Qur'an on several occasions but

that on each of these occasions, inmate Banks refused to accept the offer, stating that he wanted a

"Noble" Qur'an instead (doc. no. 159-2, p. 35).   During the time period in question in this case, the

chaplaincy department did not have any Noble Qurans because no outside entity had donated any

to the institution.   The nature of the cover of a Qur'an is not important; rather, it is the contents that are

significant. Thus, a ban on hardcover books in the SSNU does not have the effect of placing any

pressure on a Muslim inmate to violate his beliefs, as a paperback Qu'ran provides the same

information.  As such, Plaintiff has failed to meet his burden under RLUIPA of showing that the ban

on hardcover books in the SSNU placed "substantial pressure" on him to substantially modify his

behavior and violate his beliefs.  Thus, Plaintiff has not demonstrated that the policies and decisions

at issue have placed a substantial burden on his religious practice.  Consequently, Defendants are

entitled to summary judgment as to Plaintiff's claims under RLUIPA.

Because Plaintiff has not demonstrated that Defendants placed a substantial burden

on the exercise of his religion under RLUIPA, he has failed to show that Defendants violated his

rights under the Free Exercise Clause of the First Amendment.  *See*, e.g.,  Pressley v. Beard, 266

Fed.Appx. 216, 218-219, 2008 WL 501524 (3d Cir. Feb. 26, 2008) (holding that confiscation of

hard-bound Qu'ran, prayer rug, and kufi did not support free exercise of religion claim under the First Amendment); Sharp v. Johnson, 2008 WL 941686 (W.D. Pa. April 7, 2008) (holding that Plaintiff did not carry his burden to show that failure to provide him group religious services and disallowance of his prayer rug imposed a substantial burden upon the his exercise of his Muslim religion).

### E. Eighth Amendment

In the instant action Plaintiff alleges that the conditions of confinement in the SSNU violated the Eighth Amendment prohibition against cruel and unusual punishment. Specifically, he complains that "supermax" prison housing adversely affects mentally ill prisoners and that, as a result of the constant illumination, he has developed eye problems, sleeping disorders, headaches and mental problems due to lack of sleep.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment's prohibition against cruel and unusual punishment guarantees that prison officials must provide humane conditions of confinement. Prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). In order to prove an Eighth Amendment claim, a prisoner must show that the condition, either alone or in combination with other conditions, deprived him of "the minimal civilized measure of life's necessities," or at least a "single, identifiable human need." Wilson v. Seiter, 501 U.S. 294 (1991) (citing Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). The Supreme Court has explained that the first showing requires the court objectively to determine whether the

deprivation of the basic human need was "sufficiently serious."

> [E]xtreme deprivations are required to make out a
> conditions-of-confinement claim. Because routine discomfort is "part
> of the penalty that criminal offenders pay for their offenses against
> society, only those deprivations denying 'the minimal civilized
> measure of life's necessities' are sufficiently grave to form the basis
> of an Eighth Amendment violation."

Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citations omitted).

Second, an inmate must demonstrate deliberate indifference to prison conditions on the part of prison officials.  Farmer, 511 U.S. at 833; Wilson, 501 U.S. at 297; Rhodes, 452 U.S. at 347.  The second prong requires a court subjectively to determine whether the officials acted with a sufficiently culpable state of mind. "[O]nly the unnecessary and wanton infliction of pain implicates the Eighth Amendment."  Farmer, 511 U.S. at 834 (quotation omitted).

> [A] prison official cannot be found liable under the Eighth
> Amendment for denying an inmate humane conditions of
> confinement unless the official knows of and disregards an excessive
> risk to inmate health or safety; the official must both be aware of
> facts from which the inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the inference.... The
> Eighth Amendment does not outlaw cruel and unusual "conditions";
> it outlaws cruel and unusual "punishments."

Farmer, 511 U.S. at 838.  Furthermore, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Id., 511 U.S. at 845.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

Plaintiff fails to allege any facts to demonstrate that the conditions of his confinement in the various security level five housing units deprived him of any basic human need such as food,

clothing, shelter, sanitation, medical care or personal safety. Neither classification nor confinement to segregation, either administrative or punitive, implicates the Cruel and Unusual Punishment Clause of the Eighth Amendment unless the conditions themselves are cruel and unusual. Hutto v. Finney, 437 U.S. 678, 686 (1978); Young v. Quinlan, 960 F.2d 351, 363 (3d Cir. 1992); Gibson v. Lynch, 652 F.2d 348, 352 (3d Cir. 1981) ("administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment") (citing Hutto), *cert. denied*, 462 U.S. 1137 (1983).

The Constitution does not mandate comfortable prisons. Rhodes, 452 U.S. at 349. Prisons housing "persons convicted of serious crimes cannot be free of discomfort." *Id.* Here, Plaintiff was housed in the SSNU, the SMU, the RHU and the LTSU. The Pennsylvania courts unanimously have held that confinement in these restrictive conditions, without more, does not violate the Eighth Amendment. *See, e.g.*, Griffin v. Vaughn, 112 F.3d. 703 (3d Cir. 1997) (holding that the restrictive conditions in administrative custody in the Pennsylvania state correctional institutions, in and of themselves, do not violate the Eighth Amendment); Fortson v. Kelchner, 2009 WL 693247, At *3 (W.D. Pa. Mar. 13, 2009) (granting Defendants' Motion to Dismiss as to Plaintiff's Eighth Amendment claim regarding confinement in the RHU and SMU); Pressley v. Blaine, 544 F.Supp.2d 446, 453 (W.D.Pa. 2008) (holding that 1080 days of disciplinary confinement did not implicate the Eighth Amendment); Dantzler v. Beard, 2007 WL 5018184, at *11-12 (W.D. Pa. Dec. 6, 2007) (holding that the conditions of confinement in the SMU and LTSU did not amount to cruel and unusual punishment in violation of the Eighth Amendment); Woods v. Abrams, 2007 WL 2852525, 14 (W.D. Pa. Sep. 27, 2007) (holding that the conditions of confinement in the LTSU did not satisfy the objective component of an Eighth Amendment claim); Banks v. Beard, 2006 WL

2192015, at *11 (W.D.Pa. Aug. 1, 2006) (same); Rivera v. Pennsylvania Dept. of Corrections, 837 A.2d 525, 530-532 (Pa. Super. 2003) (same).

Plaintiff contends that the constant illumination in the SSNU violates the Eighth Amendment. Requiring inmates to live in constant illumination, under certain circumstances, may rise to the level of an Eighth Amendment violation. *See* Bacon v. Minner, 2007 WL 1157138 (3d Cir. April 19, 2007) (citing Keenan v. Hall, 83 F.3d 1083, 1090-91 (9th Cir. 1996) (holding that claims of constant illumination so that inmate cannot discern day from night and which caused "grave sleeping problems" and other mental and psychological problems created a disputed issue of material fact). However, continuous exposure to low wattage night time security lighting may be permissible based on legitimate penological interests, such as prison security concerns. Turner v. Safley, 482 U.S. 78, 89 (1987); Chavarria v. Stacks, 102 Fed. Appx. 433, 436-37 (5th Cir. 2004) ("policy of constant illumination [was] reasonably related to the legitimate penological interest of guard security"); O'Donnell v. Thomas, 826 F.2d 788, 790 (8th Cir.1987) (continuous lighting in holding cell not unreasonable given security concern); King v. Frank, 371 F.Supp.2d 977, 984- 85 (W.D. Wisc. 2005) (constant exposure to a 9 watt fluorescent light which allows prison officials to observe inmates at night did not violate Eighth Amendment standards); Willis v. Terhune, 404 F.Supp.2d 1226, 1230-31 (E.D. Cal. 2005) (exposure to 24 hour 13 watt security bulb did not constitute cruel and unusual punishment in absence of evidence of "grave sleeping problems" or other harm).

Plaintiff alleges that constant illumination in the SSNU prevented him from adequately sleeping and that this caused a variety of sleep-related eye and psychological problems. Pursuant to DOC policy, there is a "night light" on at all times in the cells in the RHU and SSNU.

This light remains on at all times, however, it is relatively dim and is not the main light in the cell (doc. no. 159-2, p. 15).  This light remains on for security concerns. It enables the officers on duty to ensure that the inmates are not preparing to harm staff members or themselves or otherwise violating institutional rules.

Defendants argue that the security light Banks complained of does not constitute cruel and unusual punishment in violation of the Eighth Amendment as it provided only minimal illumination.  Plaintiff offers no evidence that he suffered from "grave sleeping conditions" or any medical or psychological problems due to the SSNU security light policy.  Specifically, Plaintiff has not presented any evidence that he sought medical attention for symptoms purportedly attributable to the lighting conditions in his cell. Thus, the Court finds Plaintiff has failed to establish a likelihood of success on the merits of this claim.  Consequently, Defendants are entitled to summary judgment.  *Accord* Brown v. Martinez, 2007 WL 2225842, T *8 (M.D. PA. July 31, 2007).

Next Plaintiff contends that the conditions of confinement in the SSNU constitute cruel and unusual confinement as to mentally ill prisoners.  This contention totally is without support in the record as DOC policy firmly establishes that DOC established the SSNU to provide inmates with identified mental health issues the opportunity of a specialized treatment program to assist him/her in returning to a general population Special Needs Unit (SNU).  Upon admission to the SSNU, psychology staff interview and assess the inmate and screen for any acute mental health symptoms including potential suicide risk and conduct appropriate assessments (doc. no. 159-2, p. 43).  Within 48 hours, the unit Psychological Services Specialist reviews his or her initial Individual

Treatment Plan (ITP)[6] with the inmate and outlines specific targeted goals and objectives. The SSNU Management Team then conducts an initial review of the inmate's ITP within three working days. Within 14 days, a psychiatric assessment is completed. *See* 13.8.1, Access to Mental Health Care Procedures Manual, Section 10 - Secure Special Needs Unit (SSNU).

Thus, with the establishment of the SSNU, DOC has recognized the need for special care for inmates with psychiatric needs who also have a long history of disciplinary infractions. These inmates can not be placed in general housing due to the threat they pose to other inmates and staff and, therefore, by necessity, must be housed in higher security units. The SSNU was developed to aid these inmates by providing greater access to mental health treatment with the goal of allowing them to be released into a general SNU. Plaintiff has not submitted any evidence to show that the conditions of confinement in the SSNU amount to a violation of the Eighth Amendment with respect to the inmates housed therein. Consequently, the Court finds Plaintiff has failed to establish a likelihood of success on the merits of this claim and Defendants are entitled to summary judgment.

### F. Fourteenth Amendment - Due Process

Plaintiff next claims that Defendants' actions in placing him in the SSNU and his continued confinement therein violated his rights under the Due Process Clause of the Fourteenth Amendment because he was not provided with notice or a hearing. The Due Process Clause does

---

6. Individual Treatment Plan (ITP)  A series of written statements specifying the particular course of treatment and the roles of staff in carrying it out. It is based on an assessment of the inmate's needs, and it includes a statement of short and long-term goals as well as the methods by which these goals will be pursued. When clinically indicated, the treatment plan gives inmates access to the range of supportive and rehabilitative services (such as physical therapy, individual or group counseling, and self-help groups) that the treatment plan deems appropriate. To the extent feasible, the inmate shall participate in the development of his/her ITP.  DC-ADM 13.8.1, Access to Mental Health Care Procedures Manual, Glossary.

not protect every change in the conditions of confinement having a substantial adverse impact on a prisoner.  Meachum v. Fano, 427 U.S. 215, 224 (1976).  The Due Process Clause shields from arbitrary or capricious deprivation only those facets of a convicted criminal's existence that qualify as "liberty interests."  Hewitt v. Helms, 459 U.S. 460 (1983); Morrissey v. Brewer, 408 U.S. 471 (1972).  The types of protected liberty interests are not unlimited.  The interest must rise to more than an abstract need or desire and must be based on more than a unilateral hope.  Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.  Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (citation omitted).

Thus, the threshold question presented by Petitioner's claim is whether Defendants' actions impacted a constitutionally-protected liberty interest.  A liberty interest may arise either from the Due Process Clause itself, or from a statute, rule, or regulation.  Hewitt, 459 U.S. at 466.

1.    Liberty Interest Inherent in Due Process Clause

A liberty interest inherent in the Constitution arises when a prisoner has acquired a substantial, although conditional, freedom such that the loss of liberty entailed by its revocation is a serious deprivation requiring that the prisoner be accorded due process.  Gagnon v. Scarpelli, 411 U.S. 778, 781 (1973).  Interests recognized by the Supreme Court that fall within this category include the revocation of parole, Morrissey, 408 U.S. at 471, and the revocation of probation, Gagnon, 411 U.S. at 778.  The Due Process Clause, however, does not create an inherent liberty interest to remain free from administrative segregation.  See, e.g., Hewitt, 459 U.S. at 468; Wolff, 418 U.S. at 556; Montayne v. Haymes, 427 U.S. 236, 242 (1976); Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995); Layton v. Beyer, 953 F.2d 839, 845 (3d Cir. 1992).  Accordingly, Plaintiff can succeed under the Due Process Clause only if state law or regulation has created a constitutionally-

23

protected liberty interest in remaining free from administrative detention.

      2.    <u>Liberty Interest Created by Law or Statute</u>

      In <u>Sandin v. Conner</u>, 515 U.S. 472 (1995) the Supreme Court dramatically narrowed the range of liberty interests created by law and regulation.  Prior to <u>Sandin</u>, courts reviewed the specific language of the pertinent law or regulation to determine whether the language was unmistakably mandatory in character such that it created a liberty interest.  The Supreme Court announced a new rule in Sandin for determining whether a prisoner had a protected liberty interest created under statute or regulation by shifting the focus of inquiry from the specific language of the law or regulation to whether the deprivation suffered by the prisoner imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Sandin</u>, 515 U.S. at 483.

      Every court that has addressed this issue in Pennsylvania has determined that prisoners do not have a liberty interest in remaining free from confinement in the RHU, SMU, LTSU or similar housing.  *See, e.g.*, <u>Smith v. Dodrill</u>, 2009 WL 62175 (M.D.Pa. Jan. 8, 2009); <u>Spencer v. Kelchner</u>, 2007 WL 88084 (M.D.Pa. Jan. 9, 2007); <u>Dantzler v. Beard</u> 2007 WL 5018184 (W.D.Pa. Dec. 6, 2007); <u>Francis v. Dodrill</u>, 2005 WL 2216582 (M.D.Pa. Sept.12, 2005).  Moreover, the Court of Appeals for the Third Circuit has held that an inmate sentenced to an aggregate of 930 days in disciplinary confinement in the RHU did not constitute an atypical and significant hardship sufficient to trigger a liberty interest under <u>Sandin</u>.  *See* <u>Young v. Beard</u>, 227 Fed. Appx. 138, 2007 WL 824172 (3d Cir. 2007).  Accordingly, this Court finds that Plaintiff has not alleged any state created liberty interest that has been violated by Defendants' actions.

      The simple fact is that Plaintiff is serving a life sentence.  As of November of 2005,

he had 96 misconducts, including 22 for assault (doc. no. 159-3, p. 16).  As of September 18, 2007, he had accrued disciplinary time up until August 29, 2016 (doc. no. 159-3, p. 24).  This court will not second guess the decision of DOC as to Plaintiff's appropriate housing.  *See* Johnson v. Hill, 910 F.Supp. 218, 220 (E. D. Pa. 1996) (holding that, absent a state-created liberty interest that does not exist in Pennsylvania, prisoner placement is a matter of prison administration and a prisoner has no constitutional right to be placed in any particular cell or housing unit).

Moreover, the record shows that Plaintiff is receiving periodic review of his placement (doc. no. 159-3, pp. 8- 36).  As pointed out by Defendants, to the extent Plaintiff does have a liberty interest under Sandin, a finding this Court does not make, he has been afforded all of the process that he is due because he received regular periodic reviews by the Program Review Committee (PRC) .  *See* Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000) (holding that periodic review of inmate indefinitely confined in administrative confinement comported with due process requirements); Delker v. McCullough, 103 Fed.Appx. 694 (3d Cir. 2004) (same).  Accordingly, Defendants are entitled to summary judgment as to Plaintiff's due process claim.  *Accord* Fortson v. Kelchner, 2009 WL 693247, At *3 (W.D. Pa. Mar. 13, 2009) (granting Defendants' Motion to Dismiss as to Plaintiff's Fourteenth Amendment claim regarding confinement in the RHU and SMU); Pressley v. Blaine, 544 F.Supp.2d 446, 453 (W.D.Pa. 2008) (holding that 1080 days of disciplinary confinement did not constitute an atypical and significant hardship sufficient to trigger a protected liberty interest under the Fourteenth Amendment); Dantzler v. Beard, 2007 WL 5018184, at *11-12 (W.D. Pa. Dec. 6, 2007) (holding that Defendants were entitled to summary judgment on procedural due process claim concerning placement and continued confinement in the SMU and LTSU).

## G. Fourteenth Amendment - Equal Protection

Finally, Plaintiff argues that his equal protection rights were violated. "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.' " Vacco v. Quill, 521 U.S. 793, 799 (1997) (quoting U.S. CONST. amend. XIV, § 1). This is not a command that all persons be treated alike, but, rather, a direction that all persons similarly situated be treated alike. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race," Whren v. United States, 517 U.S. 806, 813 (1996), or any other suspect classification. *See, e.g.*, Bakke v. Cal. Bd. of Regents, 438 U.S. 265, 291 (1978) (holding that "the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color" and stating that "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination").

The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification. Classifications involving suspect or quasi-suspect class, or impacting certain fundamental constitutional rights, are subject to heightened or "strict" scrutiny. City of Cleburne, 473 U.S. at 439. Other classifications are subject to the "rational basis" test, which requires that a classification need only be rationally related to a legitimate state interest to survive an equal protection challenge. F.C.C. v. Beach Communications, Inc., 508 U.S. 307 (1993) (statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts); Chapman v. United States, 500 U.S. 453, 465 (1991).

However, with respect to prisoners, the inquiry does not end there.

Although inmates retain certain protections afforded by the Constitution, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Turner v. Safley, 482 U.S. 78, 89 (1987).   In Turner, the Supreme Court determined that prison regulations alleged to infringe upon an inmate's First Amendment rights must be reviewed under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Id*.   In so concluding, the Court held that when a prison regulation impinges on inmates' constitutional rights "the regulation is valid if it is reasonably related to legitimate penological interests." *Id*.   In determining whether the regulation was "reasonably related," the Court developed a four-factor test, namely:  1) whether there is a rational connection between the regulation and the penological interest asserted; 2) whether inmates have an alternative means of exercising their rights; 3) what impact accommodation of the right will have on guards, other inmates and the allocation of prison resources, and 4) whether alternative methods for accommodation exist at de minimis cost to the penological interest asserted.  *Id*. at 89-91. The Court of Appeals for the Third Circuit has held that Turner applies to an inmate's Equal Protection claim.  *See* DeHart v. Horn, 227 F.3d 47, 61 (3d Cir. 2000).  Thus, before Plaintiff can recover on a claim of a violation of his equal protection rights, he also must show that the interference by prison officials was not rationally related to a legitimate penological interest.

In the instant matter, Plaintiff makes the following allegations that he was treated differently from those who were similarly situated to him.  First, he avers that he was denied his prayer rug and hard-cover religious texts at the SSNUs but that he was allowed these items while

he was housed in the "supermax" security level 5 housing units, the LTSU and SMU, at SCI-Fayette (doc. no. 172-4, p. 6).  Next, he asserts that Christian inmates were allowed to retain their Bibles while he and other similarly situated Muslims were denied a hard copy Qu'ran (doc. no. 172-4, p. 7).  Next, he claims that Jewish prisoners are allowed to wear their religious headgear, yarmulkes, while he was not allowed to wear his Kufi (doc. no. 172-4, p. 7).  Finally, he claims that he and other Muslims were denied access to a wall clock while housed in the SSNU at Cresson (doc. no. 172-4, p. 8).

In their Brief, Defendants set forth the following response in relation to Plaintiff's First Amendment free exercise clause claim.[7]

> Plaintiff cannot sustain his burden of demonstrating that the policies and decisions at issue are invalid under Turner; to the contrary, they clearly survive the Turner test. First and foremost, the policies and decisions at issue are clearly rationally related to a legitimate penological purpose.
>
> As discussed above, there was no wall clock in the SSNU until one was installed by Ms. Nolan in 2005, in an attempt to confer an extra benefit upon inmates housed in that unit.  The attempt backfired, as the clock caused a great deal of trouble on the unit.  For example, inmates would become belligerent and angry if appointments were not kept to the second.  Thus, the clock was creating tension in the unit, thereby posing a potential risk to the mental health of the inmates housed in that unit as well as a potential security hazard.  In addition, there was a concern that the inmates in the unit, all of whom are potentially problematic and/or violent, were timing the activity of the unit staff.  This presented a serious security concern because it potentially facilitated prohibited activity.
>
> At some point, a wall clock in a nearby area of the same building broke, and some officers replaced it by removing the clock

---

7.  Because this Court found that Defendants did not violate Plaintiff's First Amendment free exercise rights, it did not engage in the <u>Turner</u> analysis regarding Plaintiff's free exercise claims.

that was on the SSNU wall.  It was then determined that the clock should not be returned or replaced, due to security concerns and the tension it was creating in the unit at the time.  Thus, it is obvious that the decision not to replace the wall clock was rationally connected to the legitimate governmental purpose of promoting safe prisons.

Prayer rugs present several security concerns.  Prayer rugs can be used to cover the window of an inmate's cell, thus concealing the inmate's activities.  This can pose a potential danger to staff members needing access to that cell.  It could also pose a danger to the inmate himself, as he could cause harm to himself without the knowledge of the unit staff.  In addition, prayer rugs provide another potential hiding place for contraband.  Prayer rugs can also be used to clog toilets, enabling inmates to flood the housing unit.  This presents a significant safety and sanitation hazard. In addition, inmates have been known to remove threads from their prayer rugs in order to make "fishing lines."  Prayer rugs are uniquely useful for this purpose because of their already frayed edging.  The inmates use these fishing lines to pass contraband from cell to cell.  The ability to pass contraband, which could include razor blades, handcuff keys, and illicit drugs, poses a grave security risk to the institution.  Thus, it is obvious that the ban on the possession of prayer rugs in the SSNU is rationally related to the legitimate penological purpose of promoting safe and secure institutions.

Religious headgear can serve as a hiding place for contraband. Even tight-fitting headgear, such as kufis, can serve as a hiding place for small items of dangerous contraband, such as razor blades and handcuff keys.  A complete ban on religious headgear is the most practical solution to this security problem.  This is true because the alternative, which would be to permit officers to search religious headgear for contraband at any time, has proven to be impracticable and can cause significant issues.  In the past, inmates have objected strenuously to the inspection of their religious headgear, and have become quite belligerent as a result of such inspection.  Thus, it is clear that the ban on religious headwear in the DOC's Level 5 housing units is rationally related to the legitimate penological purpose of promoting safe and secure institutions.

Inmates in the SSNU are not permitted to possess hardcover books.  Thus, their Bible, Quran, or equivalent has to be soft cover. The prohibition on hardcover books in the SSNU and RHU is due to security concerns.  For example, the spine of hardcover books has been frequently used to conceal contraband, including razor blades

and handcuff keys.  In addition, inmates have been known to conceal weapons, razor blades, and handcuff keys between the pages of hardcover books by pasting two pages together.  It is easier to conceal contraband of this nature in hardcover books than in soft cover books. Thus, the prohibition on the possession of hardcover books by Level 5 inmates is rationally related to the legitimate penological purpose of maintaining safe and secure prisons. Accordingly, the first Turner factor weighs heavily in favor of the validity of the challenged regulations and decisions.

Defendants' Brief, pp. 22-25 (doc. no. 161) (internal citations omitted).

In response, Plaintiff has submitted a copy of a DOC policy, which provides that prisoners may have a hardcover dictionary in Phases 2 and 3 of level five security housing units (doc. no. 172-3, p. 36).  He further submits a copy of a memorandum dated April 10, 2007 that provides that SMU Phase V inmates are not allowed hardback cover books excepting bibles, Qu'rans or comparable religious book (doc. no. 172-3, p. 5).  Finally, he has submitted an affidavit wherein he avers that Christian inmates were allowed their bibles.[8]  This evidence provides some evidence that DOC policies have been applied in a discriminatory manner and, when viewed in the light most favorable to Plaintiff as the non-moving party, at the very least raises a question of fact as to exactly what the relevant policy is with respect to the allowance of hardcover books in security level five housing units and undermines DOC's claim that a complete ban of hardcover books is based on valid security concerns.  Because application of the Turner test regarding the allowance of Plaintiff's hardcover Qu'ran in the SSNU does not show that Defendants have met their burden for summary judgment, their motion should be denied as to this claim.

As to Defendants' assertions regarding the blanket ban on religious headgear in level

_____

8.  Reading this averment in favor of the Plaintiff, I interpret this to mean that Christians were allowed their hardcover bibles.

30

5 security housing, Plaintiff avers that Jewish prisoners in the SSNU at SCI-Cresson were allowed

to wear their yarmulkes while Muslim prisoners are not allowed to wear their Kufis (doc. no. 172-4,

p. 7).  In addition, he cites to DOC policy, DC-ADM 819 Religious Activities, which specifically

provides that "(e) Religious headgear may be retained by the inmate in a Security Level 5 Housing

Unit."  DC-819 VI.C.3.a.4.(e).  He further has provided a copy of a letter from Jeffrey Beard dated

March 7, 2001 wherein Mr. Beard wrote "that the prohibition against the wearing of Kufees in the

RHU has been lifted" (doc. no. 172-3, p. 35).  Finally, this Court is aware of at least one case where

evidence was provided that shows that Muslims were allowed to wear religious headgear in level 5

housing units.  *See, e.g.*, Pressley v. Beard, 266 Fed. Appx. 216, 219, 2008 WL 501524, at *2 (3d

Cir. Feb. 26, 2008) (noting that the Islamic Chaplain at SCI-Camp Hill stated that other Muslim

inmates confined in the SMU are allowed to wear kufis).  This evidence, when viewed in the light

most favorable to Plaintiff as the non-moving party, suggests that some inmates are allowed to posses

religious headgear in level 5 housing units and that DOC's own policy allows inmates in level 5

security housing units to retain such headgear.  At the very least this evidence raises a question of fact

as to exactly what the relevant policy is with respect to the allowance of religious headgear in level

5 security housing units, including the SSNU, and undermines DOC's claim that there exists a

complete ban on religious headgear in level 5 custody housing units and that such ban is based on

a valid security concern.  Again, application of the Turner test regarding the allowance of religious

headgear in the SSNU does not show that Defendants have met their burden for summary judgment.

Consequently, Defendants' motion should be denied as to this claim.

        With respect to the disallowance of a prayer rug, DOC's assertion that it presents a

security concern because it can be used to cover the window of an inmate's cell, provide a potential

hiding place for contraband and be used to clog toilets applies equally to an inmate's towel, sheets and other possessions. Thus, this factor appears at the very least to be neutral under the <u>Turner</u> analysis. Notwithstanding, DOC's assertion that prayer rugs pose a security concern because they are uniquely useful to make "fishing lines" weighs heavily in favor of Defendants as DOC claims that inmates use these fishing lines to pass contraband from cell to cell. This activity poses a grave security risk to the institution and it seems that the ban on the possession of prayer rugs in the SSNU is rationally related to the legitimate penological purpose of promoting safe and secure institutions. Moreover, as stated earlier, inmates do not require a prayer rug in order to say their mandatory prayers. Any clean surface will suffice, including a towel or even a clean floor. Thus, there are other alternatives available that fully accommodate security level 5 Muslim inmates' religious requirements. The same is true with respect to the availability of a wall clock. Defendants submitted evidence that the clock raised security concerns and that Muslim inmates could ask officers for the time and were able to hear televisions and radios in the common area to determine the proper time for prayers. Thus, analysis of the <u>Turner</u> factors supports granting summary judgment in favor of the Defendants as to these claims.

## III.   <u>CONCLUSION</u>

For the reasons set forth above, it is respectfully recommended that Defendants' Motion for Summary Judgment (doc. no. 158) be granted except as to Plaintiff's equal protection claims regarding Defendants' denial of his hardcover Qu'ran and his religious headgear.

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have ten days from the date of the service of this report and recommendation to file written objections thereto. Any

party opposing such objections shall have ten days from the date on which the objections are served

to file its response. A party's failure to file timely objections may constitute a waiver of that party's

appellate rights.

_____

Lisa Pupo Lenihan
U.S. Magistrate Judge

Dated: November 13, 2009

       Ronald Banks, DZ-5843
       SCI Retreat
       660 State, Route 11
       Hunlock Creek, PA 18621-3136