IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD BANKS, ) | |
| PLAINTIFF, ) | C.A. No. 06- 253J |
| ) | |
| v. ) | District Judge Joy Flowers Conti |
| ) | |
| JEFFREY A. BEARD, JOHN S. ) | |
| SHAFFER, DONALD T. VAUGHN, ) | |
| DONALD WILLIAMSON, ) | |
| DR. FREDERICK MAUE, DR, LANCE ) | Docket No. 180 |
| COUTURIER, SUPERINTENDENT ) | |
| DAVID J. GOOD, MICHAEL F. ) | |
| KNOTT, KAREN NOLAN, FRANCIS ) | |
| PIROZOLLA, LADD OWEYO, DAVE ) | |
| ROBERTS, JAMES HARRINGTON, ) | |
| JAMIE BOYLES, ) | |
| ) | |
| DEFENDANTS. ) | |

## MEMORANDUM ORDER

The case filed by plaintiff Ronald Banks ("Banks" or "plaintiff") was transferred from the United States District Court for the Middle District of Pennsylvania on November 30, 2006, and referred to a United States Magistrate Judge for pretrial proceedings in accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrate Judges.

The magistrate judge's report and recommendation (Docket No. 178), filed on November 13, 2009, recommended that the motion for summary judgment (Docket No. 158) filed by defendants Jeffrey A. Beard, John S. Shaffer, Donald T. Vaughn, Donald Williamson, Dr. Frederick Maue, Dr. Lance Couturier, Superintendent David J. Good, Michael F. Knott, Karen Nolan, Francis Pirozolla, Ladd Oweyo, Dave Roberts, James Harrington, and Jamie Boyles (collectively, "defendants") be granted except as to plaintiff's equal protection claims under the Fourteenth Amendment regarding

defendants' denial of his hard cover Qu'ran and his religious headgear while he was in custody at SCI-Cresson.

Plaintiff filed lengthy objections to the report and recommendation on December 4, 2009. (Docket No. 182.) In these objections, Banks reiterated the same arguments he made in his lengthy responses to defendants' motion for summary judgment. The report and recommendation adequately and appropriately addresses the issues raised in plaintiff's objections with the exception of one issue relating to plaintiff's procedural due process claim regarding his confinement in the Long term Segregation Unit ("LTSU") and Special Management Unit ("SMU") at SCI-Fayette and the Secure Special Needs Unit ("SSNU") at SCI-Cresson and other state correctional institutions. Plaintiff cites to the decision of the United States Supreme Court in Wilkinson v. Austin, 545 U.S. 209 (2005). In that decision, the Supreme Court held that there is no liberty interest created directly by the Fourteenth Amendment that prevents an inmate from being subjected to programs such as the SMU or the LTSU. Austin, 545 U.S. at 221 ("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."). The Court, however, recognized "that a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in Sandin v. Conner, 515 U.S. 472 . . . (1995)." Id. at 222.

In Sandin, the Supreme Court held that an inmate's assignment to disciplinary segregation for thirty days did not impose an "atypical, significant deprivation" that implicated an inmate's liberty interest. Sandin, 515 U.S. at 486. In reaching this conclusion, the Court explained that disciplinary segregation at the prison generally "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," the inmate's confinement in segregation "did not

2

exceed similar, but totally discretionary, confinement in either duration or degree of restriction," and the inmate's segregation would not "inevitably affect the duration of his sentence." Id. at 486-87.

The Court was confronted with a much different situation in Wilkinson, where it held that placement in Ohio's maximum-security prison, the Ohio State Penitentiary ("OSP"), did implicate an inmate's liberty interest. The Supreme Court concluded that assignment to the OSP "impose[d] an atypical and significant hardship under any plausible baseline," and listed several factors that distinguished such confinement from the disciplinary segregation at issue in Sandin:

> For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in Sandin placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. . . . While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. . . .

Austin, 545 U.S. at 223-24 (citations omitted).

Upon finding a protected liberty interest, the Court utilized the framework established in Mathews v. Eldridge, 424 U.S. 319 (1976), to evaluate the sufficiency of the particular procedures in determining what process was due an inmate whom Ohio seeks to place in the OSP. In Mathews, the Court held that the requirements of due process, which are flexible and should be tailored to the situation, contemplate consideration of three distinct factors:

3

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

Applying the Mathews procedural due process balancing test, the Supreme Court held that Ohio's policy provided a sufficient level of process for placement in the OSP. Such procedures required the inmate to receive notice of the factual basis for his placement, opportunities for rebuttal, and multiple levels of review of any decision recommending supermax placement. Austin, 545 U.S. at 228.

Applying these rationales to the matter at hand, this court will assume for purposes of this opinion that plaintiff submitted sufficient evidence to show that his lengthy confinement in the various restricted housing units that are the subject of the complaint, including the LTSU, the SMU and now the SSNU, constitutes an atypical and significant hardship in relation to the ordinary incidents of prison life under any plausible baseline applicable to the Sandin analysis. Thus, the question becomes whether Banks received the process that was due for his continued confinement.

Utilizing the Mathews balancing test, the Court of Appeals for the Third Circuit has determined that a state prisoner in long-term administrative segregation received all the process he was due where post-transfer periodic review of his placement in segregation provided the inmate with a meaningful opportunity to challenge the grounds of his continued segregation. See Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000). The federal courts in Pennsylvania, including the Court of Appeals for the Third Circuit, have applied the ruling in Shoats to Pennsylvania prisoners housed

4

in restricted housing units such as the LTSU and the SMU. See McKeithan v. Beard, 322 Fed. App'x 194, 199 (3d Cir. 2009) (holding that prisoner's due process claim failed because he received periodic reviews while in the LTSU); Brown v. Pa. Dep't of Corrections, 290 Fed. App'x 463, 465-66 (3d Cir. 2008) (same); Dantzler v. Beard, Civ. No. 05-1727, 2008 WL 744740, at *1 (W. D. Pa. Mar. 18, 2008) (same for LTSU and SMU). The Court of Appeals for the Third Circuit repeatedly has applied the holding in Shoats and held that post-transfer periodic review comports with due process requirements for prisoners serving lengthy sentences who are housed in restrictive administrative custody for indefinite periods of time. See, e.g., Gans v. Rozum, 267 Fed. App'x 178, 180-81 (3d Cir. 2008) (prisoner in administrative custody status for eleven years ); Williams v. Sebek, 299 Fed. App'x 104, 107 (3d Cir. 2008) (holding that inmate's continued confinement in administrative custody for five and one-half years did not require a remedy because the record showed that he was receiving the required periodic reviews of his status by the program review committee); Brown v. D.O.C. Pa., 265 Fed. App'x 107, 110 (3d Cir. 2008) (same); Bowen v. Ryan, 248 Fed. App'x 302, 304 (3d Cir. 2007) (prisoner in administrative custody status for twenty years on restricted release status).

In the current action, plaintiff complains about his placement in the LTSU and his continued confinement in the SSNU. Any claim concerning his initial placement in the LTSU is barred by the two-year statute of limitations applicable to actions under 42 U.S.C. § 1983.[1] To the extent Banks is complaining about his placement in restricted housing units like the SSNU, he failed to submit

---

1. The limitations period for civil actions brought under 42 U.S.C. § 1983 is determined by state law. See Wilson v. Garcia, 471 U.S. 261, 272-76 (1985). Under Pennsylvania law, the applicable limitations period for civil rights actions asserted under 42 U.S.C. § 1983 is two years. See 42 PA. CONS. STAT. § 5524.

5

any evidence that he is not receiving regular periodic reviews and that the reviews do not provide a meaningful opportunity to review his continued placement.

As explained in the report and recommendation, the SSNU was designed to provide an inmate who has identified mental health issues and numerous restricted housing unit ("RHU") placements (e.g., disciplinary time), with a specialized treatment program to assist him or her in returning to a general population special needs unit ("SNU"). The SSNU is a five-phased multi-disciplinary treatment program. (Docket No. 159-2 at 43.) Participation in the treatment program is based on a phase system in accordance with the SSNU privileges chart. The treatment phase system uses progressive steps to increase privileges based on appropriate inmate behavior and compliance with his or her individual treatment plan ("ITP"). The initial treatment phase is determined by the inmate's present level of functioning, recent historical information, and mental status. The SSNU treatment team recommends all treatment phase changes and the SSNU team and the program review committee ("PRC") monitor the behavior of every SSNU inmate and may grant specific privileges according to the phase system. The SSNU team, in conjunction with the PRC, may terminate all phases and privileges at any time, based upon the inmate's behavior and compliance with his or her ITP. (Docket No. 159-2 at 43.) Accordingly, as inmates progress through the system, they are afforded additional privileges. An inmate is housed in a SSNU for a maximum of eighteen months, unless extended by the SSNU management team. (Docket No. 159-2 at 39.)

In support of their motion for summary judgment, defendants submitted copies of Banks' periodic reviews dating from July 27, 2005 through March 18, 2009. (Docket No. 159-2 at 8-37.) The first review dated July 27, 2005 indicates that Banks was received at SCI-Cresson for admission

to the SSNU as a permanent transfer from SCI-Fayette. (Docket No. 159-2 at 9.) This review further indicates that Banks expressed an interest in applying for the SSNU program. The next review dated August 17, 2005, provides that a recommendation was received from the SSNU management team to advance Banks from level I to level II and that this advancement was approved by the PRC. (Docket No. 159-2 at 10.) On November 8, 2005, there was a periodic review which reflected that Banks was transferred to SCI-Mahoney as an administrative separation from SCI-Cresson. (Docket No. 159-2 at 13.) This review indicates that Banks has a long misconduct history with approximately ninety-eight misconducts including twenty-two for assault. The PRC noted that since his arrival at SCI-Mahoney, Banks was moved to a POC cell for mental health issues and, in that unit, he caused damage by removing the plate from the wall and damaging the intercom system. Reports further indicate that Banks was defecating on the floor and spreading feces on the walls and windows of his cell and that he was loud, arrogant and obnoxious to the staff. When the PRC spoke to Banks, he indicated that he was going to jump off the sink in his cell. Banks was transferred to the mental health unit ("MHU") at SCI-Frackville on November 10, 2005.

Banks was transferred to the LTSU at SCI-Fayette on or about March 14, 2006. (Docket No. 159-2 at 16.) He was housed in that unit until it was discontinued in February 2007 and became the SMU. During that time period, he received numerous misconducts. (Docket No. 159-2 at 16.) Banks refused to attend his SMU placement hearing. (Docket No. 59-2 at 16.) While housed in the SMU, Banks continued to receive misconducts and his reviews note that his behavior was deplorable, he assaulted guards by throwing feces on them, and he refused to attend his reviews. (Docket No. 159-2 at 17-19.) On May 29, 2007, it is noted that Banks was professing a desire to progress through the SMU. The deputy superintendent made the following remarks:

7

> I highly doubt his sincerity.  I would caution staff that Banks may be manipulating his position to again assault staff.  <u>Be cautious</u>.  Do not relax security procedures!

(Docket No. 159-2 at 20 (emphasis in original).)  It was recommended to keep him on his current phase and monitor for improvement over the next months for possible progression.  (<u>Id.</u>)

He was reviewed again in July 2007 and his review indicates he received another misconduct since his last review.  (Docket No. 159-2 at 21.)  Banks attended his review and asked for extra library privileges, which were approved pending available space.  It was noted that Banks' behavior was improving and he indicated that he had goals of making it in general population.  (Docket No. 159-2 at 26.)  In November 2007, Banks was advanced to Phase IV.  (Docket No. 159-2 at 27.)  His next review on January 3, 2008, indicates satisfactory progress.  (Docket No. 159-2 at 15.)

> On January 28, 2008, the SSNU PRC recommended the following.
>
> The SSNU PRC recommends that inmate Banks remain at a Phase 5. This represents inmate Banks' 10th PRC review.  Since his last PRC review, Inmate Banks has damaged the light fixtures in two cells, and was placed in the restraint chair.  He has incurred 6 misconducts, for refusing to obey an order, destroying, altering, tampering with property, engaging or encouraging unauthorized group activity, and self mutilation.  Inmate Banks continues to be uncooperative and confrontational with staff, and continues to attempt to manipulate other inmates.  Inmate Banks is encouraged to cooperate with staff and interact appropriately with other inmates.

(Docket No. 159-2 at 29.)

He was transferred to the SSNU at SCI-Camp Hill on or about April 9, 2008.  On April 16, 2008, his multi-disciplinary review team ("MRT") recommended that he be admitted to Phase V pursuant to the SSNU policy and procedures, which were explained to Banks at that time.  (Docket No. 159-2 at 30.)  He was encouraged to cooperate with staff in order to earn phase reductions and

8

additional privileges.  On April 23, 2008, the MRT recommended to keep Banks on Phase V and noted that, since his inception at Camp Hill, he had been demanding, argumentative, and disruptive on the unit and inciting other inmates.  (Docket No. 159-2 at 31.)  On June 18, 2008, it was recommended to keep Banks on Phase V and it was noted that he was uncooperative with direct orders from staff and noncompliant with prescribed medication.  (Docket No. 159-2 at 32.)  On July 16, 2008, the SSNU PRC recommended lowering Banks to Phase IV based on his behavior and his compliance with his medication.  (Docket No. 159-2 at  33.)

On August 13, 2008, the SSNU PRC recommended keeping Banks on Phase IV based on his behavior and his compliance with his medication.  (Docket No. 159-2 at 34.)   It was noted that Banks had begun individual sessions with the psychologist and had met with a teacher from the education department.  On September 10, 2008, the SSNU PRC recommended keeping Banks on Phase IV based on his behavior and his compliance with his medication, but noted that he continued to be argumentative toward staff, verbally inappropriate with the RHU team and yelled at other inmates housed in the SSNU.  (Docket No. 159-2 at 35.)  On October 18, 2008, the SSNU PRC recommended keeping Banks on Phase IV based on his behavior and his compliance with his medication but noted that he continued to be argumentative and disrespectful toward staff and attempted to disrupt and manipulate other inmates.  (Docket No.  159-2 at 36.)

Banks was transferred to the SSNU at SCI-Retreat in March 2009 where he currently resides.  His first PRC review was on April 19, 2009 and indicates that Banks was explained that he had a fresh start to try to make his goal of entering general population and educational involvement.  (Docket No. 159-2 at 37.)  The PRC recommended to keep him on his present status and noted that he would be reviewed again on April 23, 2009.  (Docket No. 159-2 at 37.)

9

The evidence discussed above reveals that Banks received regular periodic reviews of his housing placement and that these reviews provided a meaningful opportunity to review his continued placement. Banks did not submit any evidence to the contrary. Banks' situation is similar to that of the plaintiff in Shoats. As noted by the Court of Appeals for the Third Circuit in Shoats, the plaintiff was confined in administrative custody because he was "in the considered judgment of all the prison professionals who have evaluated him, a current threat to the security and good order of the institution, and to the safety of other people." Shoats, 213 F.3d at 146.

Under the circumstances of this case, where plaintiff had post-transfer periodic reviews of his placement, the court concludes, consistent with the magistrate judge's recommendation, that defendants are entitled to summary judgment with respect to plaintiff's due process claims. See Brown v. Pa. Dep't of Corrections, 290 Fed. App'x 463, 466 (3d Cir. 2008) (holding that prisoner's due process claim failed because he received periodic reviews while in the LTSU and that summary judgment was properly granted against prisoner who failed to satisfy his burden under Rule 56(e)).

After de novo review of the pleadings and the documents in the case, together with the report and recommendation, and the objections thereto, the following order is entered:

**AND NOW**, this 5th day of March 2010;

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment (Docket No. 158) is **GRANTED EXCEPT** as to plaintiff's equal protection claims regarding defendants' denial of his hardcover Qu'ran and his religious headgear.

**IT IS FURTHER ORDERED** that the report and recommendation of the magistrate judge dated November 13, 2009 (Docket No. 178), as clarified above, is **ADOPTED** as the opinion of the court.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Ronald Banks, DZ-5843
SCI Retreat
660 State, Route 11
Hunlock Creek, PA 18621-3136